UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | |
|---|---|
| JOANNE ALMBLADE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 4:20-cv-04196-SLD-JEH |
| | ) |
| CHRISTINE WORMUTH,[1] | ) |
| | ) |
| Defendant. | ) |

ORDER

Before the Court is Defendant Christine Wormuth, Secretary of the Department of the Army's ("the Army") Motion for Summary Judgment, ECF No. 6. For the reasons that follow, the motion is GRANTED.

**BACKGROUND**[2]

Plaintiff JoAnne Almblade is Korean American. At all relevant times to this suit, she worked for the Army Contracting Command-Rock Island ("ACC-RI") as a Systems Management Specialist, a position at the eleventh paygrade of the General Schedule pay scale ("GS-11"). Her first-level supervisor was Kelly Fromi, Chief of the Systems Management Branch.

---

[1] Christine Wormuth is now the Secretary of the Department of the Army. Pursuant to Federal Rule of Civil Procedure 25(d), when a public officer named in his official capacity ceases to hold office while the action is pending, his "successor is automatically substituted as a party." The Clerk is directed to terminate Ryan McCarthy as a defendant on the docket and add Christine Wormuth.
[2] At summary judgment, a court "constru[es] the record in the light most favorable to the nonmovant and avoid[s] the temptation to decide which party's version of the facts is more likely true." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Unless otherwise noted, the facts related here are taken from the Army's statement of material facts, Mem. Supp. Mot. Summ. J. 1–4, ECF No. 7; Almblade's response to the Army's statement of material facts and additional statement of facts, Mem. Resistance Mot. Summ. J. 1–10, ECF No. 8-1; and the Army's reply thereto, Reply 1–4, ECF No. 9. Both parties reference the extensive investigative file submitted to the record. *See* Investigative File, Mem. Supp. Mot. Summ. J. Ex. 1, ECF Nos. 7-1–7-3. For ease of reference, the Court provides the title of the document with the ECF page number as the pincite.

By all accounts, Almblade and Fromi had issues at work. Almblade thought Fromi did not acknowledge her performance or listen to her. When Almblade and a coworker met with Fromi to resolve an interpersonal dispute, Fromi "cut [her] off" by saying "are you going to talk over me[?]" when Almblade began to share her side of the story. Almblade Aff. ¶ 8, ECF No. 8-2. On occasion, one coworker would overhear Fromi "ma[k]e fun" of Almblade's Korean accent behind her back. Powell Decl. 4, ECF No. 7-2 at 83.

In October 2018, ACC-RI posted vacancies for two Procurement Systems Analyst positions. These positions were at the twelfth paygrade of the General Schedule pay scale ("GS-12"). The role of a Procurement Systems Analyst is to "evaluate the effectiveness of procurement automation tools and systems, develop and deliver training, interpret and implement customer outcome goals and objectives and be a liaison for the operational and administrative functions of a variety of contracting systems and processes." Selection Plan 2, ECF No. 7-2 at 14–22. Competencies in information management, oral communication, organizational performance analysis, and problem-solving were listed as evaluation criteria.

A Memorandum of Agreement ("MOA") between ACC-RI and a government employee union governed many procedural aspects of the selection process for ACC-RI promotions, including the two vacancies. The selecting official was Fromi. The approving official was Carolyn Young. A selection plan for the vacancies ("Selection Plan") incorporated the MOA's requirements, including different procedures for resume and interview evaluation depending on the number of applicants.

Five qualified applicants submitted resumes, including Almblade, who at the time was 70 years old. Three accepted interviews: Matthew Rosebrough, Christian Allen, and Almblade. Rosebrough and Allen are both white men who are younger than Almblade. At the time he

applied, Rosebrough was a GS-12 Contract Management Support Officer at the Rock Island Arsenal Garrison. Allen, like Almblade, was a GS-11 Systems Management Specialist.

Fromi interviewed the candidates in November 2018. Because there were fewer than eleven applicants, the MOA's "Ten or Less" procedures kicked in, which meant that Fromi would be the only official evaluating candidates' resumes and interviews. The MOA allowed for an observing official at the interviews, and Fromi chose an employee from another department, Adelaide Tkatch.[3]

In an effort to ensure consistency, the MOA requires that interviews be conducted in the same manner. Thus, Fromi was required to ask each candidate the same set of questions. Fromi had four pre-determined questions roughly corresponding to the evaluation criteria on the job announcement. She awarded points to each candidate for their responses according to a rubric outlined in the Selection Plan.

A maximum of 100 points was possible. Overall, Allen had a total score of 94, Rosebrough had a total score of 72, and Almblade had a total score of 60, although Almblade received higher scores than Rosebrough on two of the four questions. On December 4, 2018, Fromi selected Rosebrough and Allen for the positions. Her selections were approved by Young.

Almblade received notification of her non-selection on December 12. It was then that she "realized that [Fromi] was discriminating against [her] and [she] had minimal chance of getting the position." Almblade Resp. Dec. 12, 2018 Harrison Email, ECF No. 7-1 at 219.

---

[3] In an attachment to her declaration to the Equal Employment Opportunity ("EEO") office, Almblade stated that Tkatch's presence created a "hostile interview environment" because of Tkatch's involvement in what Almblade describes as a previous instance of discrimination in 2014. File for EEO, ECF No. 7-1 at 195–96 ("I have been discriminated against in job advancement several times over the years by supervisors and Ms. Adeline Tkatch. . . . [At the interview,] Ms. Tkatch was using the same intimidation tactic she used in 2014."). But in her briefing, Almblade argues that whether Tkatch had any discriminatory motive is "irrelevant" to the case. Mem. Resistance Mot. Summ. J. 13. The Court notes that at summary judgment, "[t]he non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment." *Nichols v. Michigan City Plant Plan. Dep't*, 755 F.3d 594, 600 (7th Cir. 2014).

Although Almblade had the option of meeting with Fromi to discuss her non-selection, Almblade thought Fromi "would not have let [her] express [her] thoughts in a closed door meeting . . . and would not allow [her] to challenge [Fromi's] selection." *Id.* So on December 13, Almblade made initial contact with the Equal Employment Opportunity ("EEO") office, alleging that she was better qualified than the selectees and that Fromi's decision was based on her age and national origin.

On January 10, 2019, Almblade filed a formal discrimination complaint with the EEO. On September 18, 2020, she filed this suit, alleging that the Army discriminated against her by failing to promote her on the basis of national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 42 U.S.C. §§ 2000e–2000e-17, and age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–34. Compl., ECF No. 1. The Army now moves for summary judgment on both counts.

## DISCUSSION

### I. Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is also appropriate if the party opposing summary judgment fails to establish a genuine issue of fact on an element essential to its case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Where one party has properly moved for summary judgment, the non-moving party must respond "by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017). The court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there

is a genuine issue for trial"—that is, whether "there is sufficient evidence favoring the non[-]moving party for a jury to return a verdict" in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Patel v. Allstate Ins. Co.*, 105 F.3d 365, 370 (7th Cir. 1997). The court must view the evidence "in the light most favorable to the non-moving party[] and draw[] all reasonable inferences in that party's favor." *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010) (citing *Anderson*, 477 U.S. at 255). "A genuine issue for trial exists only when a reasonable jury could find for the party opposing the motion based on the record as a whole." *Pipitone v. United States*, 180 F.3d 859, 861 (7th Cir. 1999) (quoting *Roger v. Yellow Freight Sys., Inc.*, 21 F.3d 146, 149 (7th Cir. 1994)).

## II. Analysis

Almblade asserts that she was discriminated against based on her national origin and age. The Court addresses these claims in turn.

### a. National Origin Discrimination

Title VII prohibits the federal government and its agencies, including military departments, from discriminating against employees and applicants for employment on the basis of national origin. 42 U.S.C. § 2000e-16(a). At summary judgment, "the singular question that matters" is "[w]hether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018) (quoting *Ortiz v. Werner Enterprises*, Inc., 834 F.3d 760, 765 (7th Cir. 2016)). "Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself." *See Ortiz*, 834 F.3d at 765.

"[T]he well-known and oft-used *McDonnell Douglas* framework for evaluating discrimination remains an efficient way to organize, present, and assess evidence in discrimination cases." *Johnson*, 892 F.3d at 894. Under this framework, a plaintiff has the initial burden to establish a *prima facie* case of discrimination. *Jaburek v. Foxx*, 813 F.3d 626, 631 (7th Cir. 2016) (noting that to establish a *prima facie* case for a failure to promote claim, a plaintiff must produce of evidence that: "(1) she was a member of a protected class; (2) she was qualified for the position sought; (3) she was rejected for the position; and (4) the employer promoted someone outside of the protected group who was not better qualified for the position that she sought"). If she does so, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its decision, then returns to the plaintiff to show that the employer's reason is pretextual. *See Johnson v. Gen. Bd. of Pension & Health Benefits of United Methodist Church*, 733 F.3d 722, 728 (7th Cir. 2013). In contrast, under *Ortiz*, the court simply evaluates "whether the totality of the evidence shows discrimination, eschewing any framework or formula." *Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 958 (7th Cir. 2021); *see also David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017) ("In adjudicating a summary judgment motion, the question remains: has the non-moving party produced sufficient evidence to support a jury verdict of intentional discrimination?").

The Army argues that Almblade can neither show she was better qualified than the selectees nor offer sufficient evidence to support a discrimination verdict. Mem. Supp. Mot. Summ. J. 7–9, ECF No. 7. Almblade asks the Court to "focus on the ultimate question whether [sic] a reasonable jury could find that the plaintiff was discriminated against on the basis of her national origin." Mem. Resistance. Mot. Summ. J. 11, ECF No. 8-1. Because Almblade does not proceed under the *McDonnell Douglas* framework, the Court will follow her approach and

ask whether she has "produced sufficient evidence to support a jury verdict of intentional discrimination." *David*, 846 F.3d at 224; *see Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 880 (7th Cir. 2016) (suggesting that when a plaintiff does not present her response to a summary judgment motion in *McDonnell Douglas* terms, the court need not analyze the case through that framework).

### i. Almblade's Qualifications

The Army maintains that Rosebrough and Allen were the most qualified candidates in accordance with the criteria set forth in the Selection Plan. Mem. Supp. Mot. Summ. J. 8. Rosebrough and Allen received the highest interview scores based on their answers. *Id.* In contrast, Fromi stated that Almblade's interview answers "did not demonstrate the desired attributes and abilities for the position" and "lacked complexity and depth." Fromi Decl. 5, ECF No. 7-2 at 10.

Almblade contends she was better qualified than both selectees and that the Army's rationale is therefore pretext for discrimination, or "a lie." *See* Mem. Resistance Mot. Summ. J. 11–12 (citing *Jordan v. Summers*, 205 F.3d 337, 344 (7th Cir. 2000)). She points to the fact that she had previously been detailed to the Procurement Systems Analyst position for 120 days.[4] Mem. Resistance Mot. Summ. J. 6–11. She also argues that Fromi's notes failed to capture her interview responses adequately, omitting critical facts about her qualifications. *Id.* at 11. Finally, she believes Fromi's assessment of her answers was subjective. *Id.* at 11–12.

"Where an employer's reason for a[n adverse action] is without factual basis or is completely unreasonable, that is evidence that an employer might be lying about its true

---

[4] Almblade previously alleged that she was more qualified than Rosebrough specifically because he had not previously worked in the department, Compl. ¶ 12, but the Court notes that she waived this argument by not raising it in her response. *See Nichols*, 755 F.3d at 600.

motivation." *Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 646 (7th Cir. 2013). But courts do not sit as "super personnel review board[s] that second-guess[] an employer's facially legitimate business decisions." *Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (quotation marks omitted). In failure to promote cases, the Seventh Circuit has held that

> where an employer's proffered non-discriminatory reason for its employment decision is that it selected the most qualified candidate, evidence of the applicants' competing qualifications does not constitute evidence of pretext unless those differences are so favorable to the plaintiff that there can be no dispute among reasonable persons of impartial judgment that the plaintiff was clearly better qualified for the position at issue.

*Mlynczak v. Bodman*, 442 F.3d 1050, 1059 (7th Cir. 2006) (quoting *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1180 (7th Cir. 2002)).

Almblade fails to offer such evidence. Allen had held the same position as her, a GS-11 Systems Management Specialist. Rosebrough was already a GS-12 level employee, and he explained in his interview that his position had given him experience with the same programs and systems used by ACC-RI. *See* Interview Notes 129, ECF No. 7-1 at 129.

Almblade's 120-day tenure as a Procurement Systems Analyst is not "so favorable to [her] that there can be no dispute among reasonable persons of impartial judgment that [she] was clearly better qualified." *Mlynczak*, 442 F.3d at 1059 (quotation marks omitted). The law does not require the Army make past experience a determinative factor in employment decisions: An employer is allowed to "make a calculated business decision by weighing the relative merits and deficiencies of [the] candidates." *Dunn v. Nordstrom, Inc.*, 260 F.3d 778, 787 (7th Cir. 2001); *see also Millbrook*, 280 F.3d at 1181 ("[T]his court must respect the employer's unfettered discretion to choose among qualified candidates." (quotation marks omitted)). Familiarity with specific information management systems was only one of the four posted evaluation criteria for

the job, *see* Job Announcement 3, ECF No. 7-1 at 18, and the law permits Fromi to prioritize other factors even if Rosebrough or Allen were less familiar with those systems.

Almblade's argument that Fromi's notes from the interview were insufficient is also unpersuasive. Fromi wrote three pages of notes for Almblade, three pages of notes for Rosebrough, and five pages of notes for Allen. *See* Interview Notes, ECF No. 7-1 at 126–36. Almblade offers no evidence suggesting that Fromi's notes regarding the other selectees were any more comprehensive or accurate, so no inference can be drawn. Even if the Court assumed Fromi's notes were inadequate, Almblade does not explain how better notes would show she was not just more qualified, but markedly superior. Rather, as her own briefing appears to concede, when the additional information Almblade provided in the interview is included, her "qualifications are equal to or exceed those of Christian Allen or Matthew Rosebrough." Mem. Resistance Mot. Summ. J. 11.

Finally, Almblade argues that the interview scoring was "completely subjective." *Id.* at 12. Here, the MOA – which Almblade elsewhere argues was not followed to her detriment – was the reason that Fromi was the only official who evaluated the candidates. And "nothing in Title VII bans outright the use of subjective evaluation criteria." *Sattar v. Motorola, Inc.*, 138 F.3d 1164, 1170 (7th Cir. 1998). In the context of job interviews, "[a] subjective analysis of the varying traits of each applicant is entirely appropriate" where employers must evaluate traits that defy objective quantification, such as communication and problem-solving here. *Blise v. Antaramian*, 409 F.3d 861, 868 (7th Cir. 2005) (finding that an interview scored based on subjective criteria was not evidence of pretext).

In sum, even if Almblade could establish she is as – or even more – qualified then Rosebrough and Allen, she has not offered evidence sufficient to eliminate any dispute she was

9

clearly better qualified. Thus, she fails to establish that her non-selection could be construed as pretextual on that ground.

### ii. Resume Scoring

Next, Almblade argues that Fromi did not follow the MOA because she failed to score the resumes. *See* Mem. Resistance Mot. Summ. J. 12.[5] Although somewhat unclear, it appears that her argument here is not that a score of the resumes would have proven her more qualified, but rather that Fromi's failure to score the resumes calls into question to the legitimacy of the interview process.

The Army maintains that the MOA does not require resume scores when ten or fewer candidates apply to a position. Reply 2, ECF No. 9. The disputed language, specifically, appears to be "[t]he selecting official will be the only one evaluating and scoring the resume and interview. . . . The selecting official will evaluate resume and interview responses and document their score." MOA, ECF No. 7-1 at 173.

 "Significant, unexplained or systematic deviations from established policies or practices can no doubt be relative and probative circumstantial evidence of discriminatory intent." *Hanners v. Trent*, 674 F.3d 683, 694 (7th Cir. 2012); *see Rudin v. Lincoln Land Cmty. Coll.,* 420 F.3d 712, 723 (7th Cir. 2005) (finding that an employer's failure to follow its hiring guidelines by not convening a Screening Committee, where ten members would evaluate candidates collectively, was evidence of pretext). Even if this failure to score the resumes would deviate from the Selection Plan, the deviation would not be unexplained: Fromi (and presumably her approving official) did not think that scoring resumes was required under the "Ten or Less"

---

[5] Almblade also maintains that Fromi implemented a cutoff score of 71 in violation of the MOA and the Selection Plan, *see* Mem. Resistance. Mot. Summ. J. 2, but she does not make any argument relating to this fact in her briefing, so it is waived as an argument here, *see Nichols*, 755 F.3d at 600.

procedures specified by the MOA. Nor could the failure to score the resumes be described as significant because the person scoring the resumes would have been Fromi. Thus, this is not a situation where the employer's deviation from its policies bypassed a potentially outcome-determinative group deliberation, *see Rudin*, 420 F.3d at 723, or where the employer subjected one applicant to a job to a different procedure than the candidates. In this context, Fromi's failure to score resumes, even if procedurally improper, does not support an inference of discrimination on the basis of national origin.

### iii. Past Promotions

Almblade also notes that all of Fromi's selections for promotions over the two-year period prior to Almblade's non-selection were white and under 40, arguing that this supports an inference of discrimination. Mem. Resistance Mot. Summ. J. 12 n.1. According to the list Almblade cites, Fromi made only four promotions in that two-year period, including one individual who was promoted twice. List, ECF No. 7-1 at 70. In this case, the Court, and a jury, can glean little from the list because there is no information about rejected applicants, their qualifications, their national origins, or even the national origins of the selectees. *See Millbrook*, 280 F.3d at 1177 ("Without knowing how many of the forty Quality Control Inspector positions became available during that time frame, the number and race of the candidates applying for those positions, and the candidates' relative qualifications, such a list is next to worthless." (quotation marks omitted)). Thus, a reasonable jury could not draw an inference of discrimination here.

### iv. Workplace Incidents

Almblade next discusses two specific incidents in the workplace that she believes support an inference of discrimination. *See* Mem. Resistance Mot. Summ. J. 12. In the first incident,

11

Almblade and a coworker met with Fromi to discuss an interpersonal conflict. When Almblade began to share what had happened, Fromi said "are you going to talk over me[?]" and did not let Almblade share her perspective. Almblade Aff. ¶ 8. In the second incident, Almblade was seated away from the main group during an office outing to see a holiday movie, which Almblade believes Fromi did intentionally. Mem. Resistance Mot. Summ. J. 12. The Army responds that Fromi was not responsible for seating, that others were also seated away from the group, and that the incident occurred on December 12 after Fromi had already selected Rosebrough and Allen. Reply 6.

Taking Almblade's account as true, these incidents suggest a relationship between Almblade and Fromi that was sometimes tense and less than cordial. But aside from Almblade's speculation as to Fromi's motivations, there is no evidence that Fromi's conduct in either case was motivated by Almblade's national origin. *See Hanners*, 674 F.3d at 694 ("Although Mr. Hanners may believe that the defendants' statements are evidence of racial animus, the subjective beliefs of the plaintiff . . . are insufficient to create a genuine issue of material fact." (quotation marks omitted)). Indeed, coworkers of other national origins were also seated away from the main group.

Title VII prohibits discrimination on the basis of national origin, but it does not protect employees from brash bosses. *See Overly v. KeyBank Nat'l Ass'n*, 662 F.3d 856, 865 (7th Cir. 2011) (observing that facts suggesting a supervisor does not like an employee do not necessarily support the inference that the supervisor does not like the employee for a discriminatory reason). The question is not whether Fromi treated Almblade poorly, but whether her treatment was on the basis of Almblade's national origin. These incidents do not support that inference.

### v. Fromi's Comments about Almblade's Accent

Finally, Almblade told an EEO investigator – although she did not reiterate this allegation in her complaint, briefing, or affidavit – that Fromi sometimes made passing comments about her Korean accent, "correct[ing] [her] speech sarcastically when [she] doesn't say a word/phrase correctly." EEO Counselor's Report 2, ECF No. 7-1 at 12. One of Almblade's coworkers also observed Fromi commenting on Almblade's accent. Coworker Sarah Powell said that Fromi and unspecified other employees "made fun of [Almblade] behind her back about how she speaks." Powell Decl. 4, ECF No. 7-2 at 83. Powell said that another coworker, a "close friend[]" of Fromi's, was the "ringleader" of a "bandwagon" against Almblade, and "ha[d] often been observed in the smoking room speaking negatively/making fun of [Almblade's] accent/and implying that she is stupid." *Id.* at 5, ECF No. 7-2 at 84. That employee was allegedly given special privileges by Fromi. *Id.* A second coworker, Lisa Lawson, said in her declaration that Almblade was treated as the "stepchild" of the organization, and that "[s]ome [people] had trouble understanding her because of her accent" and "would talk down to her." Lawson Decl. 3, ECF No. 7-2 at 87. However, Lawson did not mention having ever heard Fromi (or any other employee) making fun of Almblade's accent.

"[A]ccent is generally recognized as a manifestation of national origin." *Hasham v. Cal. State Bd. of Equalization*, 200 F.3d 1035, 1050 (7th Cir. 2000). While passing comments regarding an employee's accent may support an inference of discrimination, such comments are usually considered "stray remarks" insufficient to defeat summary judgment unless they are made by the decisionmaker, around the time of the decision, and in reference to the adverse employment action. *See Bagwe*, 811 F.3d at 885; *see, e.g., Volovsek v. Wis. Dep't of Agric., Trade & Consumer Prot.*, 344 F.3d 680, 690 (7th Cir. 2003) (holding that summary judgment

was improper where the plaintiff overheard, almost immediately after learning of her non-promotion, supervisors making derogatory comment about women because the remark was "so close in time and in substance to the alleged act of discrimination"). The Army argues Fromi's comments are mere stray remarks insufficient to establish an inference of discrimination. Mem. Supp. Mot. Summ. J. 9.

Here, it is undisputed that Fromi was the decisionmaker, so the Court considers the time and substance of the comments. The record is ambiguous on both. Only one coworker, Powell, overheard Fromi making fun of Almblade's accent. As to timing, both Powell and Lawson moved to another area of the office after being reassigned to a different supervisor in April 2017. *See* EEO – Support Statement from Co-Workers, ECF No. 7-2 at 4 (indicating Powell was transferred with Lawson); Lawson Decl. 3, ECF No. 7-1 at 87 ("I actually sat next to Joanne for a couple of years from Apr 2015 – Apr 2017. . . . I did see how Joanne was treated by Kelly when I worked down there in 2015-2017."). And Powell is not specific as to what Fromi actually said. Almblade, who did not repeat her allegation to EEO regarding Fromi's comments in any material submitted to the Court, was also not specific as to timing in that allegation. This timeline suggests any mocking comments about Almblade's accent on the record are at least a year removed from when the Procurement Systems Analyst selection process began in October 2018.

There is no bright line for when a decisionmaker's remarks are timely enough support an inference of discrimination, but the Seventh Circuit has found similar gaps in time are too distant to support such an inference. *See, e.g., Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 569 (7th Cir. 2015) (finding comments made seven months prior to termination too "far removed" to support an inference of retaliation); *Dass v. Chi. Bd. of Educ.*, 675 F.3d 1060, 1063, 1072 (7th Cir. 2012)

(finding that principal's comment that India-born teacher should find a job at neighborhood school "where most of the Indian kids go," made ten months prior to her termination, was not contemporaneous or causally related to her discharge).

Although comments about an employee's accent in the workplace are troubling, "[a]mbiguous comments so far removed from the adverse employment action are insufficient, without more, to defeat summary judgment." *Castro*, 786 F.3d at 569. Here, Almblade has not submitted evidence into the record about Fromi's comments, their timing, or their context that would show the comments were either causally related to her non-selection or support the inference that Almblade's non-selection was due to national origin discrimination.

### vi. The Evidence as a Whole

Finally, the Court considers the evidence as a whole. *See Ortiz*, 834 F.3d at 765. Although Almblade contends many facts in this case support an inference of discrimination, she fails to connect the dots and show how any of those facts demonstrate that she was discriminated against because of her national origin. Comments about Almblade's accent are most troubling, but are ambiguous and by themselves, insufficient to defeat summary judgment. *See Castro*, 786 F.3d at 569. As such, the Court finds Almblade has failed to show that the evidence as a whole supports an inference of discrimination. *See Gorence v. Eagle Food Ctrs., Inc.*, 242 F.3d 759, 763 (7th Cir. 2001) ("[I]t is simply not true . . . that if a litigant presents an overload of irrelevant or nonprobative facts, somehow the irrelevancies will add up to relevant evidence of discriminatory intent. They do not; zero plus zero is zero."). Accordingly, the Court grants the Army's Motion for Summary Judgment on this claim.

### b. Age Discrimination

The ADEA makes it unlawful for an employer "to fail or refuse to hire . . . any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a). At summary judgment, the analytical approach of an ADEA case is similar to that of a Title VII case. *See Igasaki*, 988 F.3d at 960 ("Although Title VII turns on a broader motivating factor theory of liability, the relevant standard under the ADEA is whether age was the but for cause of the allegedly discriminatory employment action." (quotation marks omitted)). As with Title VII, an ADEA plaintiff can proceed under *McDonnell Douglas* or *Ortiz*. *See id*. "However the plaintiff chooses to proceed, at the summary judgment stage the court must consider all admissible evidence to decide whether a reasonable jury could find that the plaintiff suffered an adverse action *because of* her age." *Carson v. Lake Cnty, Ind.*, 865 F.3d 526, 533 (7th Cir. 2017). As before, the Court will follow Almblade's lead and consider the evidence as a whole under *Ortiz*.

To support her claim of age discrimination, Almblade alleges that on three to five occasions in 2018, Fromi asked her when she was planning to retire. *See* Mem. Resistance Mot. Summ. J. 12–13. The Army disputes that Fromi ever asked Almblade about her retirement. *See* Mem. Supp. Mot. Summ. J. 10; Reply 4. Because the Court must resolve this dispute in Almblade's favor, the relevant question becomes whether this evidence would allow a reasonable jury to find that Almblade was not promoted because of her age. *See Carson*, 865 F.3d at 533.

"[R]epeated references to retirement may permit a jury to infer discrimination," such as when "an employee in the protected age group [is] hounded about retirement despite evidence of adequate performance." *Kaniff v. Allstate Ins. Co.*, 121 F.3d 258, 263 (7th Cir. 1997). Such

comments can support an inference of discrimination because they "may reflect the employer's intention to rid itself of older workers by subtly pressuring them into retiring." *Id.* But even "requests that an employee retire are not necessarily a reference to the employee's age." *Halloway v. Milwaukee Cnty.*, 180 F.3d 820, 825 (7th Cir. 1999). Comments about retirement can be "stray remarks," which, as previously noted, typically do not create an inference of discrimination. *See Mach v. Will Cnty. Sheriff*, 580 F.3d 495, 499 (7th Cir. 2009).

Here, Almblade does not allege that Fromi *requested* that she retire, only that Fromi asked her when she would. *See* Mem. Resistance Mot. Summ. J. 12–13. Nor does Fromi appear to have "hounded" Almblade: Fromi asked Almblade about her retirement on three to five occasions over a period of at least several months.[6] *See id.* at 5, 12–13. Whereas the Seventh Circuit in *Kaniff* provided one example of how repeated references to retirement could support an inference of unlawful termination, here, Almblade was not terminated. *See Kaniff*, 121 F.3d at 263. And she does not argue that her non-selection was an attempt to induce her into retirement. Thus, any possible inference of discrimination from Fromi's comments is even more attenuated in this case because her comments cannot be said to relate to the adverse employment action of non-promotion in the same way as when those comments might prelude an unlawful termination. *See id*.

Beyond these comments – and her belief in her own qualifications, addressed above – Almblade's only other evidence of age discrimination is her coworkers' speculation. Therefore, she cannot meet her burden of showing a reasonable jury could find she was not promoted because of her age. *Cf. O'Connor v. DePaul Univ.*, 123 F.3d 665, 672 (7th Cir. 1997) (holding

---

[6] According to Almblade's affidavit, Fromi asked her about retirement on three to five occasions "in 2018." Almblade Aff. ¶ 2. But her briefing states that these incidents all took place during the summer. Mem. Resistance. Mot. Summ. J. 5. The Army does not dispute that the comments were made during the summer of 2018. Reply 3.

that stray remarks "may not overcome summary judgment if they stand alone as evidence that might support an inference of pretext" in an age discrimination case). Accordingly, the Court grants the Army's Motion for Summary Judgment on this claim.

## CONCLUSION

Accordingly, the Motion for Summary Judgment, ECF No. 6, is GRANTED. The Clerk is directed to enter judgment and close the case.

Entered this 23rd day of September, 2021.

s/ Sara Darrow<br>
SARA DARROW<br>
CHIEF UNITED STATES DISTRICT JUDGE